UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ATM EXPRESS, INC., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> ATM EXPRESS, INC., ) <br> ) <br> Defendant; ) <br> _____ ) <br> ) <br> AND RELATED COUNTERCLAIM. ) <br> _____ ) | Civil No. 07cv1293-L(RBB) <br><br> **ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR SUMMARY ADJUDICATION, AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR SUMMARY ADJUDICATION** |

In this trademark infringement action, the parties filed cross-motions for summary judgment, or in the alternative, summary adjudication. The parties opposed each other's motions.[1] For the reasons which follow, Defendant's motion for summary adjudication of all of Plaintiff's claims is **GRANTED**. Plaintiff's motion is **DENIED**.

It is undisputed that both parties use the name ATM Express in connection with the sale and leasing of automated teller machines and related services. Plaintiff first began using the name in June 1997. Defendant started using it in April 1999. In 2001, Plaintiff learned about Defendant's use. In November 2003, Plaintiff filed an application with the United States Patent

---

[1] Defendant's combined opposition and reply brief was untimely filed. The court issued an Order to Show Cause why the brief should not be stricken, and Defendant responded. Based on Defendant's response, the court considered Defendant's brief in ruling on these cross-motions.

and Trademark Office to register the ATM Express name. It received a registration in the Supplemental Register[2] in July 2005. In 2001 Defendant earned revenues of approximately $3.5 million and a net income of approximately $35,000. From 2001 through 2007, Defendant earned more than $162 million in revenues and more than $6 million in net income. (Joint Statement of Undisputed Facts filed Dec. 15, 2008 ("Joint Statement"), at 2-3.)

In July 2007 Plaintiff filed the instant action for trademark infringement pursuant to 15 U.S.C. § 1114(1), false designation of origin pursuant to 15 U.S.C. § 1125(a), cybersquatting pursuant to 15 U.S.C. § 1125(d) and unfair competition pursuant to California Business and Professions Code § 17200 *et seq*. Defendant filed a counterclaim for cancellation of Plaintiff's federal trademark registration pursuant to 15 U.S.C. § 1119.

In its summary judgment motion, Defendant argues that at the time Defendant started using the ATM Express name, Plaintiff's mark did not have a secondary meaning so as to be entitled to trademark protection and that Plaintiff's action is barred by laches. In the alternative, Defendant argues that it is entitled to summary adjudication of the cybersquatting claim because there is a triable issue of fact whether it used the atmexpress.com domain name in bad faith, and that it is entitled to summary adjudication of certain damage claims. Plaintiff argues that it is entitled to summary judgment because Plaintiff infringed its trademark. Because the court finds that Plaintiff's action is barred by laches, it need not address other arguments raised in the motions.

Federal Rule of Civil Procedure 56 empowers the court to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 327 (1986). "If summary judgment is not rendered on the whole action, the court should, to the extent practicable, determine what material facts are not genuinely at issue." Fed. R. Civ. P. 56(d)(1).

Summary judgment or adjudication of issues is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

---

[2] Plaintiff did not receive registration in the Principal Register. (*See* Def's Ex. A.)

there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material when it affects the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" of material fact arises if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The burden on the party moving for summary judgment depends on who bears the burden of proof at trial. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *See C.A.R. Transp. Brokerage Co., Inc. v. Darden Restaurants, Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted). When the moving party would not bear the burden at trial, then he or she can meet its burden on summary judgment by pointing out the absence of evidence with respect to any one element of the claim. *See Celotex*, 477 U.S. at 325.

If the movant meets its burden, the burden shifts to the nonmovant to show summary adjudication is not appropriate. *Celotex*, 477 U.S. at 317, 324. The nonmovant does not meet this burden by showing "some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmovant must go beyond the pleadings to designate specific facts showing there are genuine factual issues which "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

The mere fact the parties filed cross-motions "does not necessarily mean there are no disputed issues of material fact and does not necessarily permit the judge to render judgment in favor of one side or the other." *Starsky v. Williams*, 512 F.2d 109, 112 (9th Cir. 1975). "[E]ach motion must be considered on its own merits." *Fair Hous. Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). Furthermore, the court must consider evidence submitted in support of and in opposition to both motions before ruling on either one. *Id.*

When ruling on a summary judgment motion, the nonmovant's evidence is to be believed, and all justifiable inferences are to be drawn in its favor. *Anderson*, 477 U.S. at 255. Determinations regarding credibility, the weighing of evidence, and the drawing of legitimate inferences are jury functions, and are not appropriate for resolution by the court on a summary judgment motion. *Id.* Only admissible evidence may be considered in deciding a motion for summary judgment. *See* Fed. R. Civ. P. 56(e).

Defendant argues that Plaintiff's claims are barred by laches because Plaintiff delayed the filing of this action for approximately six years after discovering Defendant's allegedly infringing use of the ATM Express name. During this time, Defendant's business grew significantly. Plaintiff contends that the defense is not available to Defendant because it was entitled to wait and see whether the infringement will become sufficient to warrant litigation and because Defendant is not entitled to the defense based on the unclean hands doctrine.

A defense of laches can defeat an otherwise valid trademark infringement claim. *Tillamook Country Smoker, Inc. v. Tillamook County Creamery Ass'n*, 465 F.3d 1108 (9th Cir. 2006). It can be resolved on summary judgment. *See, e.g., Tillamook Country Smoker,* 465 F.3d 1102; *Miller v. Glenn Miller Prod., Inc.*, 454 F.3d 975 (9th Cir. 2006); *Grupo Gigante SA de CV v. Dallo & Co., Inc.*, 391 F.3d 1099 (9th Cir. 2004); *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829 (9th Cir. 2002).

Plaintiff argues that the period for laches started when it "determined that litigation was actually necessary" rather than when it discovered Defendant's allegedly infringing conduct. (Pl.'s Mem. of P.&A. at 22.) This is not the case. "The limitation period for laches starts from the time the plaintiff knew or should have known about its potential cause of action." *Tillamook Country Smoker*, 465 F.3d at 1108 (internal quotation marks and citations omitted). In 2001 Plaintiff learned of Defendant's use of the name ATM Express in connection with the same business as Plaintiff. (Joint Statement at 2.) Accordingly, the laches period started in 2001,

/ / / / /

/ / / / /

/ / / / /

when Plaintiff discovered the allegedly infringing conduct. *See Tillamook Country Smoker*, 465 F.3d at 1109.[3]

"The Lanham Act does not contain a statute of limitations, and therefore Lanham Act claims are governed by the analogous state statute of limitations." *Miller*, 454 F.3d at 997 n.11. Defendant asserts, and Plaintiff does not dispute (Pl.'s Mem. of P.&A. at 20, 21), that the most closely analogous state statute of limitations in this case is California's four year statute for state trademark infringement and unfair competition. *See Miller*, 454 F.3d at 997 n.11; *see also* Cal. Code Civ. Proc. § 343; Cal. Bus. & Prof. Code § 17208. If the plaintiff filed the trademark infringement action within the period of the most closely analogous state law statute of limitations, "there is a strong presumption against laches. If the plaintiff filed outside that period, the presumption is reversed." *Tillamook Country Smoker*, 465 F.3d at 1108. "[T]he presumption of laches is triggered if any part of the claimed wrongful conduct occurred beyond the limitations period." *Jarrow Formulas*, 304 F.3d at 837. The presumption shifts the "burden of going forward with evidence to rebut or meet the presumption, but does not shift the burden of proof in the sense of the risk of nonpersuasion, which remains . . . upon the party on whom it was originally cast." Fed. R. Evid. 301; *see also A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1037-38 (Fed. Cir. 1992).

Because of the six-year delay, Plaintiff filed the instant action after the four-year statute of limitations has expired. The presumption of laches therefore applies. A six-year delay after constructive notice of infringement has been found sufficient to bar a trademark action. *See E-*

/ / / / /

---

[3] Plaintiff's reliance on *General Bedding Corporation v. Echevarria* and *Karl Storz Endoscopy, Inc. v. Surgical Techs., Inc.* is without avail.

In *General Bedding* the court noted that the fraud statute of limitations under California law begins to run when the aggrieved party discovers the facts constituting the fraud. 947 F.2d 1395, 1397 (9th Cir. 1991). Here it is undisputed that Plaintiff discovered Defendant's alleged infringement in 2001.

In *Storz Endoscopy* the plaintiff became aware of the defendant's business before defendant started its infringing practice. 285 F.3d 848, 857 (9th Cir. 2002). The court held that the statute of limitations did not begin to run until defendant started its allegedly wrongful conduct. *Id.* In contrast, Plaintiff in this case claims that infringement commenced when Defendant started using the ATM Express name and before Plaintiff's discovery in 2001.

*Sys., Inc. v. Monitek, Inc.*, 720 F.2d 604 (9th Cir. 1983); *see also Grupo Gigante*, 391 F.3d 1088 (4-year delay); *Jarrow Formulas*, 304 F.3d 829 (7-year delay).

Regardless of the length of the delay, however, to determine whether the plaintiff's delay in filing suit was unreasonable and the suit barred by laches, the court must consider six factors: "(1) strength and value of trademark rights asserted; (2) plaintiff's diligence in enforcing the mark; (3) harm to senior user if relief is denied; (4) good faith ignorance by junior user; (5) competition between senior and junior users; and (6) extent of harm suffered by the junior user because of senior user's delay." *Tillamook Country Smoker*, 465 F.3d at 1108 (internal quotation marks and citations omitted). "The party asserting laches must demonstrate that it has suffered prejudice as a result of the plaintiff's unreasonable delay in filing suit." *Tillamook Country Smoker*, 465 F.3d at 1108 (internal quotation marks and citations omitted).

Regarding the first factor, the strength and value of the trademark rights asserted, Plaintiff argues the mark is suggestive and Defendant argues that it is descriptive. "Descriptive or suggestive marks are relatively weak." *Grupo Gigante*, 391 F.3d at 1102.

Furthermore, Plaintiff's trademark application to register ATM Express in the Principal Register was refused because it closely resembled an already registered mark and the registration would cause confusion with that mark, and because Plaintiff's mark was found descriptive of its services.[4] (Def.'s Ex. D at 115-16.) The alleged mark is a composite of descriptive terms – ATM, standing for automated teller machine, and "express." "A term is suggestive if 'imagination' or a 'mental leap' is required in order to reach a conclusion as to the nature of the product being referenced." *Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc.*, 198 F.3d 1143, 1147 n.3 (9th Cir. 1999) (citations omitted). It takes no imagination to arrive at the

/ / / / /

---

[4] In response to the refusal of registration in the Principal Register, Plaintiff registered its mark in the Supplemental Register. (Def.'s Ex. A.) Plaintiff did not submit evidence of secondary meaning to persuade the Patent and Trademark Office that its descriptive mark was nevertheless protectable.
    Plaintiff concedes that unlike a Principal Register registration, a registration in the Supplemental Register does not carry a presumption of trademark validity. *See* 15 U.S.C. § 1057(b). (Pl.'s Mem of P.&A. at 6 n.3.)

conclusion that the name ATM Express is descriptive of automated teller machine products or services, which is the nature of Plaintiff's business.

Plaintiff's evidence of secondary meaning consists of statements of eight individuals, two of whom are business associates rather than customers or potential customers. (Pl.'s P.&A. at 8-9 (summary of evidence)). This is insufficient to show or raise a genuine issue of material fact that "the mental association by a *substantial segment* of consumers and potential consumers between the alleged mark and a single source of the product," in this case Plaintiff, as is required to establish secondary meaning.[5] *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1354 (9th Cir. 1985) (emphasis added).

In addition, Defendant's trademark search revealed a number of businesses using "ATM Express" as a name or as part of a name, domain name or catchphrase. (Def.'s Ex. H.) Plaintiff allows that there may be other business that use ATM and Express in their names. (Pl.'s P.&A. at 21.) However, Plaintiff's CEO Christopher Bryan Stewart, who was designated by Plaintiff to testify about the information known or reasonably available to Plaintiff pursuant to Rule 30(b)(6) (Def.'s Ex. B at 129), testified that Plaintiff does not maintain that it was the only user of the ATM Express name when the company was formed (Def.'s Ex. B at 115-16) or that it had exclusive rights to the name when Defendant was formed (*id.* at 120, 122). Mr. Stewart testified that it was *not* Plaintiff's position that it had the exclusive right to the ATM Express name in the ATM business.[6] (*Id.* at 128.) Based on the foregoing, there is no genuine issue of material fact whether Plaintiff's mark is weak.

As to the second factor, the court finds that there is no genuine issue of material fact whether Plaintiff was not diligent in enforcing its allegedly protectable mark. After learning of Defendant's use of the ATM Express name in 2001 (Joint Statement at 2), Plaintiff did nothing to enforce its alleged rights until filing this action in 2007. It is undisputed that there was a six-

---

[5] In an attempt to circumvent this requirement, Plaintiff asserts that "the universe of its customers . . . is small, insular, and easily reached." (Pl.'s P.&A. at 9.) However, no evidence is offered in support of this assertion.

[6] The statement to the contrary in Plaintiff's brief is offered without any citation to evidence. (Pl.'s P.&A. at 10.)

year delay in commencing this action. Plaintiff argues the delay was reasonable on two grounds. First, it argues that it was entitled to wait and see until the scope of infringement justified the cost of litigation (Pl.'s P.&A. at 18), and second, that Mr. Stewart's ill health contributed to the delay (*id*. at 19).[7]

When Plaintiff discovered Defendant's name and its use in the same industry in 2001, it did nothing to find out about Defendant or to contact it. (Pl.'s Ex. B at 132-33.) Because the instances of confusion were infrequent, Plaintiff waited until 2007, when such instances "skyrocketed." (*Id*. at 142, 163.) Plaintiff argues that the six-year wait was appropriate because Plaintiff "has not previously had the need" to file an action.. (Pl.'s P.&A. at 21; *see also* Pl.'s Reply at 7.)

"Companies expecting judicial enforcement of their marks must conduct an *effective* policing effort. At the very least, the effort must involve actually contacting the alleged infringer about the use of a trademark." *Grupo Gigante*, 391 F.3d at 1102 (internal quotation marks and citations omitted, emphasis in original). Plaintiff did nothing for six years. There is no evidence of cease and desist letters or even telephone calls to complain about Defendant's alleged infringement. (*See* Pl.'s Ex. B at 132-33.)

Plaintiff argues that it was entitled to delay under the "wait-and-see" or "progressive encroachment" doctrine. "Under this doctrine, the trademark owner need not sue in the face of *de minimis* infringement by the junior user." *Tillamook Country Smoker*, 465 F.3d at 1110 (internal quotation marks and citations omitted). "The doctrine allows a plaintiff to delay when a defendant engages in a *de minimis* infringement at first, but then gradually encroaches on the plaintiff's market." *Grupo Gigante*, 391 F.3d at 1103. "There is no laches where the defendant's encroachment is steady but slow." *Carter-Wallace, Inc. v. Procter & Gamble Co.*, 434 F.2d 794, 803 n.4 (9th Cir. 1970).

---

[7] Defendant urges the court to disregard these arguments because they were not disclosed in response to interrogatories on the issue of Plaintiff's delay. (Def.'s Reply at 23 n.25 & 25-26; Def.'s Ex. P-S.) The court does not approve of Plaintiff's conduct which smacks of sandbagging. However, as Defendant has not briefed the issue of disregarding the arguments and excluding the related evidence, the court will nevertheless consider them.

Plaintiff claims the infringement commenced in 1999 and continues to this date. It seeks damages based on Defendant's earnings starting January 2000. (*See* Def.'s Ex. M, report of Plaintiff's damages expert William J. Buckley.) Plaintiff does not contend that Defendant expanded into different regions or different markets. *See Tillamook Country Smoker*, 465 F.3d at 1110. Its encroachment theory is that the growth of Defendant's business generally was "slow and steady." Plaintiff supports this theory with the testimony of Defendant's Senior Vice President Marty Ambuehl and Defendant's financial statements.

Drawing all justifiable inferences in Plaintiff's favor, *see Anderson*, 477 U.S. at 255, the evidence does not support the characterization of Defendant's growth as slow. Mr. Ambuehl testified that Defendant's business experienced an "explosion" in growth in 2000, after which its business steadily increased. (Pl.'s Ex. C at 37-39.) He did not mention or imply that the growth was slow. (*See id.*) Moreover, Defendant's annual revenues in millions for the years 2001 through 2007 were approximately: $7.9, $12.7, $19.3, $24.9, $27.1, $32.5 and $35.8, respectively. (Def.'s Ex. M at 222.)[8] In round numbers, the year-over-year rates of growth were: 125%, 61%, 52%, 29%, 9%, 20% and 10%. (*Id.*) Defendant's annual gross profits in millions for the same years were: $1.1, $1.5, $2.6, $3.7, $4.6, $5.8 and $7.2. (*Id.*) The year-over-year rates of growth for the gross profits were, in round numbers: 39%, 76%, 40%, 25%, 26%, 25%. There is nothing slow or particularly steady about the rates of growth in Defendant's revenues and gross profits during the six-year period of delay. Furthermore, it is implausible to argue that $8 million in annual sales of the allegedly infringing products and services in 2001 constituted *de minimis* infringement. In subsequent years, Defendant's revenues and gross profits rapidly increased. "It cannot be equitable for a well-informed merchant with knowledge

---

[8] Plaintiff cited to its Exhibit X. The exhibit is a series of financial statements, summaries and spreadsheets; however, with the exception of the financial statements which overlap with Defendant's Exhibit L, the court was not able to determine where these documents come from and Plaintiff provided no foundation or authentication for them. Only admissible evidence may be considered in deciding a summary judgment motion. Fed. R. Civ. P. 56(e). The court therefore looks to the financial statement spreadsheets in Defendant's Exhibit M, the report of Plaintiff's damages expert William J. Buckley. For the present purposes, the difference in the annual revenue and gross profit numbers stated in Defendant's Exhibit L and M, which occur starting 2004, are not material and do not alter the analysis.

of a claimed invasion of right, to wait to seek how successful his competitor will be and then destroy with the aid of court decree, much that the competitor has striven for and accomplished." *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 823 (7th Cir. 1999) (internal quotation marks and citation omitted); *see also Grupo Gigante*, 391 F.3d at 1103; *Danjaq LLC v. Sony Corporation*, 263 F.3d 942, 951 (9th Cir. 2001).

Because Plaintiff does not argue that Defendant's business changed during the period of delay in terms of its geographic scope or target market, its encroachment argument boils down to the growth in Defendant's existing business. "A junior user's growth of its existing business and the concomitant increase in its use of the mark do not constitute progressive encroachment." *Tillamook Country Smoker*, 465 F.3d at 1110. Based on the foregoing, there is no genuine issue of material fact regarding the applicability of the wait-and-see approach for six years in this case.

Plaintiff's next argument is that Mr. Stewart's illness contributed to the delay in bringing suit. Mr. Stewart was diagnosed with lupus in August 2005, pulmonary embolism in 2006 and osteonecrosis of his hip in 2007. (Pl.'s Ex. F.) His physician would not have recommended him to become personally involved in a stressful activity such as litigation during treatment for lupus. (*Id*. at 80.)

Plaintiff relies on *A.C. Aukerman Company v. R.L. Chaides Construction Co.*, 960 F.2d 1020 (Fed. Cir. 1992), for the proposition that courts have taken into account the health of the plaintiff in determining if delay in filing suit was reasonable. (Pl.'s P.&A. at 19.) However, in *Aukerman* illness was not proffered as an explanation for delay and the effect of illness on the reasonableness of delay was not decided. Instead, in a general discussion of excuses which have been recognized "in some instances," *Aukerman* listed *Frank F. Smith Hardware Co. v. S.H. Pomeroy Co.*, 299 F. 544, 546-47 (2d Cir. 1924). 960 F.2d at 1033 ("illness under limited circumstances"). Aside from the fact that *Smith Hardware* is not binding precedent, the court's decision that laches did not apply was based on other factors not present in this case rather than on illness. It is therefore inapposite.

However, the court considers Mr. Stewart's illness in the inquiry "whether the plaintiff has proffered a legitimate excuse." *Miller*, 454 F.3d at 941. Plaintiff argues that it is "a closely

held company with little staff" (Pl.'s P.&A. at 19) apparently to suggest that no one else at the company could initiate this action.  Plaintiff cites no evidence in support of this assertion and proffers no other explanation or elaboration why Mr. Stewart is the only one in the company who could initiate this litigation or why he could not instruct another employee to retain counsel. Furthermore, Plaintiff does not contend that Mr. Stewart's illness contributed to the delay before his lupus diagnosis in 2005, four years after Plaintiff's discovery of Defendant's alleged infringement.  The only explanation for the four-year delay is the wait-and-see or progressive encroachment argument.  Even when considered in the context of a shortened four-year period, the wait-and-see argument fails for the reasons discussed above.  Based on the foregoing, Plaintiff has failed to raise a genuine issue of material fact regarding its diligence in enforcing the alleged mark.

Plaintiff's only argument regarding the third factor, the harm it will suffer if relief is denied due to laches is that the "harm . . . is quantified by the damages liability." (Pl.'s Mem. of P.&A. at 20.)  This cryptic statement is insufficient to throw light on this factor.

The issue of actual confusion is relevant to the evaluation of this factor.  *See Grupo Gigante*, 391 F.3d at 1103-04.  The record in this case contains evidence of some actual confusion, primarily in 2007 and 2008.  Plaintiff concedes that the instances of confusion were infrequent until 2007.  (*See* Pl.'s Ex. B at 142, 163.)  The parties have been able to coexist for many years because their target customers are different.  While Plaintiff directs its efforts at merchants, Defendant markets to individual entrepreneurs, such as those in the pay phone business.  (Pl.'s Ex. C at 31).  Although "some instances of actual confusion make this factor a close one[,] establishing a likelihood of confusion does not automatically defeat a laches defense." *Grupo Gigante*, 391 F.3d at 1104.

Regarding the fourth factor, good faith ignorance by the junior user, Plaintiff argues that laches does not apply in this case because of Defendant's unclean hands.  "A party with unclean hands may not assert laches.  The unclean hands doctrine closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief.  The party must have acted fairly and without fraud or deceit as to the controversy in issue."  *Jarrow*

*Formulas*, 304 F.3d at 842 (internal quotation marks and citations omitted). "A plaintiff can escape laches under the unclean hands doctrine only if the court is left with a firm conviction that the defendant acted with a fraudulent intent in making the challenged claims." *Id.* at 842.

Plaintiff points to deposition testimony which shows that Defendant's employees became aware of Plaintiff's use of the ATM Express name in the fall of 1999 (Pl.'s Ex. D at 27-28), soon after Defendant was incorporated with the name of ATM Express, Inc. in April 1999 (Pl.'s Ex. C at 19). Defendant became aware that Plaintiff operated in the same industry.[9] (Pl.'s Ex. D at 28; Ex. C at 31.) Upon learning this, Defendant did not change its name. (Pl.'s Ex. C at 25-26; Pl.'s Ex. D at 28-29.) This evidence is undisputed.

However, Plaintiff omits and does not dispute other facts from the same testimony. When Defendant's founders considered what to name their company, they came up with the name themselves without knowledge that Plaintiff was already using the same name. (Pl.'s Ex. C at 19.) Before settling on a name, they performed domain name searching and searches on Yahoo.com but did not find ATM Express. (Pl.'s Ex. D at 27.) When they found out a few months after incorporating that Plaintiff was already using the name ATM Express, they had already registered their name with the State of Montana, where they were based, in order to sell their own securities in the state. (Pl.'s Ex. C at 25-26.) They had already started a private stock offering and it would have been difficult to change the name then. (*Id.*) They contacted their attorney, who determined that they "were legal from the beginning." (Pl.'s Ex. D at 28.) They considered the name to be generic (*id.* at 29); their business models targeted different customers, albeit the with the same product and service – while Plaintiff targeted merchants, Defendant targeted "individuals like people that were in the pay phone business" (Pl.'s Ex. C at 31); and at the time Defendant was based in Montana (*id.* at 32), while Plaintiff was based in Baltimore,

---

[9] Plaintiff also faults Defendant for not performing a trademark search before choosing the name ATM Express. (Pl.'s P.&A. at 16.) A trademark search would not have brought Plaintiff to Defendant's attention any earlier. Plaintiff filed its trademark application in November 2003, long after Defendant started using the name. (Joint Statement at 2.) Defendant performed an internet search and a domain name search. (Pl.'s Ex. D at 27.) It did not come across Plaintiff's name because Plaintiff did not register a domain name until October 2001. (Def.'s Ex. B at 151-52.)

Virginia and its business was on the East Coast (Def.'s Ex. B at 69-73). When Defendants found out about Plaintiff's use of the ATM Express name, they determined it was not a problem and decided to do nothing. (Pl.'s Ex. C at 25-26; Ex. D at 28.)

In support of unclean hands, Plaintiff relies on *Danjaq LLC v. Sony Corporation* and *National Lead Company v. Wolfe*. In *National Lead*, the defendant adopted a confusingly similar name in good faith when it acquired another company. However, after the plaintiff complained and the defendant assured it that it would discontinue the confusing name, defendant aggressively exploited the similarity in its advertising and attempted to pass off its products as the plaintiff's. 223 F.2d 195, 202 (1955). In light of these facts, the court rejected the laches defense as frivolous. *Id*. On the other hand, in *Danjaq*, a copyright case, the court rejected the unclean hands argument where there was evidence that the defendant knew the title to the copyright was disputed but used it anyway. 263 F.3d at 958. The court noted that "[t]o hold that willfulness must be inferred whenever an alleged infringer uses intellectual property in the face of disputed title would turn every copyright claim into willful infringement and would improperly discourage many legitimate, good faith transactions." *Id*. at 959.

"[C]onceivably, all suits involving Lanham Act claims could involve accusations of fraudulent or deceptive conduct." *Hot Wax*, 191 F.3d at 826. The unclean hands doctrine therefore requires fraudulent intent and not just infringing conduct. *Jarrow Formulas*, 304 F.3d at 842. In this case, drawing all justifiable inferences in Plaintiff's favor, the evidence supports no more than the conclusion that Defendant knew of Plaintiff's use of the ATM Express name but nevertheless continued to use it. Plaintiff has pointed to no evidence supporting a justifiable inference of fraudulent intent. While Defendant's hands may not be "as clean as snow," this is not required. *See id*. at 842; *GoTo. com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000). On the record before the court, there is no genuine issue of material fact whether Defendant's actions rise to the level of unclean hands.

Regarding the fifth factor, the competition between the senior and junior users, it is undisputed that the parties operated in the same business during the same time using the same name. (*See* Joint Statement at 2.) However, because they generally pursued a different group of

customers (*see* Pl.'s Ex. C at 31), they were not direct competition and managed to coexist for many years.

As to the last factor, the extent of harm suffered by the junior user because of the senior user's delay, Defendant argues that it is seriously prejudiced by Plaintiff's delay. There are "two chief forms of prejudice in the laches context – evidentiary and expectations-based.

Evidentiary prejudice includes such things as lost, stale, or degraded evidence, or witnesses whose memories have faded or who have died." *Danjaq*, 263 F.3d at 955. Defendant argues it will suffer evidentiary prejudice in this case because it is now impossible to conduct a reliable market survey to determine whether Plaintiff's use of the ATM Express name had acquired a secondary meaning before April 1999 when Defendant started using it.[10] In addition, due to the lengthy delay, memories have faded. Mr. Stewart could not remember many material facts about Plaintiff's business, including the income earned in 1997 and 1998 and whether Plaintiff was profitable (Def.'s Ex. B at 43-46); the scope and expense of advertising and the geographic scope of its sales territory prior to 1999 (*id*. at 69-72; 173-74, 179); and the point in time when Plaintiff's customers began to associate ATM Express with Plaintiff's business as necessary for Plaintiff's use of ATM Express to acquire a secondary meaning (*id*. at 141). These facts are relevant to the secondary meaning analysis. *See Comm. for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 822 (9th Cir. 1996). Plaintiff does not dispute Defendant's showing of evidentiary prejudice.

"A defendant may also demonstrate prejudice by showing that it took actions or suffered consequences that it would not have, had the plaintiff brought suit promptly." *Danjaq*, 263 F.3d at 955. In 2001, when Plaintiff learned of Defendant's use of the ATM Express name,

---

[10] In order to establish infringement, Plaintiff, as the senior user, must prove the existence of secondary meaning in its mark at the time when Defendant first began using the mark. *See* 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* §16:34 (2009). Plaintiff agrees. (Pl.'s P.&A. at 7.)
Plaintiff offers affidavits and deposition testimony of eight individuals in an attempt to show secondary meaning before 1999. (*See id*. at 8-9 (summary of evidence).) To shore up this meager showing, as discussed above, this is insufficient to establish association with Plaintiff as the source of ATM products and services among a *substantial segment* of customers or potential customers, as is required to establish secondary meaning. *See Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d at 1354.

1   Defendant was a small company.  In calendar year 2000, it earned approximately $3.5 million in
2   revenues with a net income of $35,696.56 (Joint Statement at 2), and in calendar year 2001 it
3   earned approximately $7.9 million with a net income of $140,798.17 (Def.'s Ex. L at 194-95).
4   Its revenues and gross profits rapidly increased from 2002 to 2007, when this action was filed.
5   (*See* discussion *supra*.)  In this period Defendant earned a total of more than $155 million in
6   revenues with a net income of more than $ 6 million. (Def.'s Ex. L at 196-208.)  Plaintiff seeks
7   damages calculated based on Defendant's earnings since the beginning of 2000 (*see* Def.'s Ex.
8   M), including the entire period Plaintiff knew about Defendant's alleged infringement but did
9   nothing about it.  Had Plaintiff asserted its alleged rights promptly, Defendant would have had
10  an opportunity to change its business strategy, including changing its name.

11          Plaintiff's only argument to counter Defendant's assertion that it is seriously prejudiced
12  by Plaintiff's delay is that Defendant had the opportunity to change its name when it found out
13  about Plaintiff in 1999.  (Pl.'s P.&A. at 20)  Plaintiff cites no support for the relevant of this
14  argument.  It has been addressed in the context of the reasonableness of Plaintiff's delay above.
15  *See Grupo Gigante*, 391 F.3d at 1102 ("Companies expecting judicial enforcement of their
16  marks must conduct an *effective* policing effort.  At the very least, the effort must involve
17  actually contacting the alleged infringer about the use of a trademark.").

18          Based on the foregoing, on balance, the factors weigh in Defendant's favor.  There is no
19  genuine issue of material fact whether Plaintiff's action should be barred by laches.[11]
20  Accordingly, Defendant's motion for summary adjudication of Plaintiff's claims is **GRANTED**
21  and Plaintiff's summary judgment motion is **DENIED**.

22          **IT IS SO ORDERED.**

24  DATED: September 11, 2009

25                                                  _____
                                                    M. James Lorenz
26                                                  United States District Court Judge

---

28      [11]     Plaintiff does not dispute that an effective laches defense disposes of all its claims.